STATE OF CONNECTICUT *v.* PASQUALE E. CIULLO
(AC 32550)

Alvord, Espinosa and Bishop, Js.

Argued September 7, 2012—officially released January 29, 2013

*Herald Price Fahringer*, pro hac vice, with whom were *Edward J. Gavin* and *Erica T. Dubno*, pro hac vice, for the appellant (defendant).

*Mitchell S. Brody*, senior assistant state's attorney, with whom, on the brief, were *David I. Cohen*, state's attorney, and *James Bernardi*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

BISHOP, J. The defendant, Pasquale E. Ciullo, appeals from the judgment of conviction, rendered following a jury trial, of three counts of unlawful restraint in the first degree in violation of General Statutes § 53a-95. The defendant claims that (1) the trial court improperly instructed the jury on the elements of unlawful restraint, self-defense and the defense of property, and marshaled the evidence in favor of the state; (2) there

was insufficient evidence to prove that he had committed the crime of unlawful restraint in the first degree; (3) prosecutorial impropriety deprived him of a fair trial; (4) the court abused its discretion with respect to alleged juror misconduct; and (5) the court improperly precluded him from entering a surveillance videotape into evidence and from eliciting certain testimony of a witness. We agree with the defendant that there is insufficient evidence as to one of the counts of unlawful restraint, but disagree as to the rest of his claims. Accordingly, we affirm in part and reverse in part the judgment of the trial court.

The jury reasonably could have found the following facts. The defendant owned and rented out a house located at 172 Byram Shore Road in Greenwich. In May, 2007, the defendant and his neighbor, Rose Pinchuk, were involved in a dispute over a stone wall and pillars that border their two properties. This dispute resulted in the use of attorneys and a survey being conducted to determine the exact location of the defendant's property line.

On July 4, 2007, Pinchuk drove to Port Chester, New York, and hired two day laborers, Victor Illescas and Job Diaz, and drove them to her house. Pinchuk directed Diaz and Illescas to install a fence, which followed her home's property line and continued into the driveway of the defendant's house. Pinchuk supplied Illescas and Diaz with the materials and tools necessary for the fence extension, including a pickax, shovel, rake and iron bar. Pinchuk and the defendant's neighbor, Martin Hyman, observed the laborers digging holes in the driveway, and Hyman called the defendant's place of residence for the purpose of reporting these happenings. When the defendant's son, Angelo Ciullo, answered the telephone at the defendant's home, Hyman informed him of the fence construction, and urged him to call

the police due to the property damage he believed was being caused by the work of Illescas and Diaz.

After receiving this telephone call, the defendant and his son drove a pickup truck to the defendant's house on Byram Shore Road and brought the truck to a sudden stop where Illescas and Diaz were working in close proximity to each other. The defendant and Angelo Ciullo left the truck, drew Walther PPK semiautomatic pistols from their holsters and began yelling at the laborers. During these initial moments of the confrontation, the defendant pulled back his pistol's slide, chambering a bullet, and he and Angelo Ciullo pointed their pistols at Illescas. The defendant and his son then approached Illescas, and the defendant grabbed Illescas by the neck, pointed his pistol at Illescas' head and ordered him to sit down. While Diaz initially ran behind Pinchuk, who was standing twelve to thirteen feet away and was calling 911 on her cell phone, he soon halted and sat down after Angelo Ciullo pointed his pistol at him. When Pinchuk screamed and ran away, the defendant instructed Angelo Ciullo to hold Illescas and Diaz together as he picked up a shovel and chased after Pinchuk along Byram Shore Road to a stone patio around the back of a neighboring house where Pinchuk fell to the ground.

When the police arrived at the scene, they encountered the defendant and Angelo Ciullo standing near Illescas and Diaz. The defendant told the police that he had instructed the laborers to stop working on his property, that he and Pinchuk had previously disagreed over the boundary separating their property and that Pinchuk had been present when they arrived at the scene but had run away. The police located Pinchuk lying on the steps of the backyard patio of the house where she had run while being pursued by the defendant. On examination, the police discovered that she had a lacerated left palm and bruising on her legs. A

subsequent police search of the defendant's pickup truck revealed that a wooden billy club and baseball bats were stored in the cab of the truck. The police then arrested the defendant and Angelo Ciullo.[1]

The state charged the defendant by way of an amended information with three counts of unlawful restraint in violation of § 53a-95, one count of assault in the first degree in violation of General Statutes § 53a-59 (a) (1) and one count of illegal possession of a weapon in a motor vehicle in violation of General Statutes § 29-38 (a). The court instructed the jury on assault, unlawful restraint and the weapon charge. The court also instructed the jury, at the defendant's request, on the law regarding the defense of premises and self-defense. Following deliberations, the jury found the defendant guilty of three counts of unlawful restraint but not guilty of the assault charge and the weapon charge. The trial court, after accepting the jury's verdict, sentenced the defendant to concurrent terms of five years incarceration on the unlawful restraint charges for a total effective sentence of five years incarceration. This appeal followed. Additional facts will be set forth as necessary.

I

We first address the defendant's claim challenging the sufficiency of the evidence at trial to sustain his conviction of three counts of unlawful restraint in the

---

[1] The defendant and Angelo Ciullo were tried together, and Angelo Ciullo was convicted of two counts of unlawful restraint, relating to Diaz and Illescas, as well as having a weapon in a motor vehicle. The trial court sentenced Angelo Ciullo to concurrent terms of five years of imprisonment on each of the unlawful restraint counts and a concurrent term of one year of incarceration on the possession of a weapon count, but suspended the execution of the term of imprisonment while imposing five years of probation. Angelo Ciullo did not appeal his conviction.

first degree in violation of § 53a-95[2] because he would be entitled to a judgment of acquittal were he to succeed on that claim. See, e.g., *State* v. *Monahan*, 125 Conn. App. 113, 118 n.7, 7 A.3d 404 (2010), cert. denied, 299 Conn. 926, 11 A.3d 152 (2011); *State* v. *Bereis*, 117 Conn. App. 360, 364–65, 978 A.2d 1122 (2009); see also *State* v. *Plourde*, 208 Conn. 455, 457, 545 A.2d 1071 (1988), cert. denied, 488 U.S. 1034, 109 S. Ct. 847, 102 L. Ed. 2d 979 (1989).

Specifically, the defendant argues that there was no evidence that he restrained any of the victims or that his behavior exposed any of them to a substantial risk of physical injury. We begin this section with a discussion of the law regarding sufficiency of the evidence before turning to an assessment of the defendant's claims as they relate to each of the three victims.

"The standard of review we apply to a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Citation omitted; internal quotation marks omitted.) *State* v. *Pond*, 138 Conn. App.

[2] General Statutes § 53a-95 (a) provides: "A person is guilty of unlawful restraint in the first degree when he restrains another person under circumstances which expose such other person to a substantial risk of physical injury."

228, 234–35, 50 A.3d 950, cert. granted on other grounds, 307 Conn. 933, 56 A.3d 714 (2012).

To establish that the defendant unlawfully restrained persons in violation of § 53a-95 (a), the state was required to prove beyond a reasonable doubt that he "restrain[ed] another person under circumstances which expose[d] such other person to a substantial risk of physical injury." General Statutes § 53a-95 (a). "To convict a defendant of unlawful restraint in the first degree, no actual physical harm must be demonstrated; the state need only prove that the defendant exposed the victim to a substantial risk of physical injury." (Internal quotation marks omitted.) *State* v. *Cotton,* 77 Conn. App. 749, 776, 825 A.2d 189, cert. denied, 265 Conn. 911, 831 A.2d 251 (2003).

At the outset, we note that the defendant makes a sufficiency claim that has bearing on his conviction regarding all three victims. The defendant asserts that the state's evidence is insufficient because there was evidence from him and Angelo Ciullo that they did not unholster their weapons in contrast to the state's evidence that they did. Therefore, on the basis of his dispute as to the state's inculpatory evidence, the defendant asserts that the evidence that he and his son unholstered and pointed their weapons was insufficient to prove the element of unlawful restraint regarding the risk of substantial injury to a victim. Here, the defendant asks this court, on review, to perform the jury's function. "[E]vidence is not insufficient [merely] because it is conflicting or inconsistent. [The fact finder] is free to juxtapose conflicting versions of events and determine which is more credible. . . . It is the [fact finder's] exclusive province to weigh the conflicting evidence and to determine the credibility of witnesses. . . . The [fact finder] can . . . decide what—all, none, or some—of a witness' testimony to accept or reject. . . . As a corollary, [q]uestions of whether to believe or to

disbelieve a competent witness are beyond our review. As a reviewing court, we may not retry the case or pass on the credibility of witnesses. . . . Our review of factual determinations is limited to whether those findings are clearly erroneous." (Internal quotation marks omitted.) *State* v. *Little*, 138 Conn. App. 106, 110–11, 50 A.3d 360, cert. denied, 307 Conn. 935, 56 A.3d 713 (2012). The jury was entitled to credit the testimony of Diaz, Illescas and Pinchuk and to reject the testimony of the defendant and Angelo Ciullo in regard as to whether the defendant had unholstered and pointed his weapon or had merely displayed it as he claimed. We turn now to the defendant's claims as they relate to each victim.

As to Illescas, the defendant appears to claim that he did not point his weapon at him and, therefore, did not expose Illescas to a substantial risk of physical injury. As noted, however, the evidence in this regard was disputed. In contrast to the defendant's factual claims, the state claimed, and witnesses testified, that the defendant, as he alighted from his motor vehicle, did point his weapon directly at Illescas. There was evidence, as well, that, as he pointed his weapon at Illescas, he ordered him to remain in place. Specifically, the jury heard testimony that the defendant approached Illescas, grabbed him by the neck and, while pointing the weapon at him, ordered him to sit down. Thus, the jury had adequate evidence that the defendant both restrained Illescas and did so in a manner that exposed Illescas to a substantial risk of physical injury.

As to Diaz, the defendant claims that while the evidence may have supported the factual conclusion that his son, Angelo Ciullo, restrained Diaz by pointing a weapon at him and confining his movement, there was no evidence that the defendant, himself, either pointed a weapon at Diaz or restricted his movement. At most, the defendant claims, he could have been charged as an accessory to Angelo Ciullo regarding the restraint

of Diaz. The defendant contends, however, that because he was charged only as a principal and not as an accessory, the evidence of his conduct regarding restraint was legally insufficient for his conviction. We are unpersuaded.

In support of this claim, the defendant points to the prosecutor's statement, during the charging conference, requesting that the defendant and Angelo Ciullo be charged as accessories because there was insufficient evidence to show that the defendant alone had committed all the elements necessary to unlawfully restrain Diaz. On appeal, the defendant argues that because the prosecutor conceded that the defendant could be liable only as an accessory for the unlawful restraint of Diaz, and the court charged the jury that the defendant and Angelo Ciullo were principals, there was insufficient evidence to prove that the defendant unlawfully restrained Diaz. On review, however, we are not bound by the prosecutor's view of the adequacy of the evidence. Rather, our inquiry is whether the jury had sufficient evidence to reasonably support its conclusion that the defendant unlawfully restrained Diaz. Contrary to the defendant's assertion and the prosecutor's apparent concession at trial, we conclude that the evidence of the defendant's conduct toward Diaz was sufficient to sustain the jury's verdict.

The jury reasonably could have found that the defendant's chambering of a bullet and pointing of the gun at Illescas, with Diaz standing in close proximity, subjected both Illescas and Diaz to the substantial risk of physical injury. There was testimony that Diaz was standing only three feet away when the defendant approached the two men and raised his loaded gun in the direction of Illescas. Evidence that both victims were in such close proximity provided an adequate basis for the jury's conclusion that each was within the zone of peril created by the defendant's brandishing of

his loaded weapon. Further evidence shows that Diaz initially ran behind Pinchuk before his movement was halted on instruction from the defendant to his son, permitting the inference that he was attempting to get away from the defendant, who was armed with a loaded weapon, and that his movement was restrained by the defendant's conduct. Thus, we believe, this evidence was sufficient when construed "in the light most favorable to sustaining the facts . . . impliedly found by the jury." *State* v. *Cotton*, supra, 77 Conn. App. 774.

Finally, as to Pinchuk, the defendant claims that there was no evidence that he restrained her and that, in fact, the undisputed evidence is that she took flight as the two men alighted from the pickup truck. We agree.

The definition of the term "restrain" is contained in General Statutes § 53a-91 (1): " 'Restrain' means to restrict a person's movements intentionally and unlawfully in such a manner as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved, without consent. . . ."

As claimed by the defendant, there is no evidence that he restricted Pinchuk's movements, let alone in "such a manner as to interfere substantially with [her] liberty" within the meaning of § 53a-91 (1). Pinchuk testified that when the defendant emerged from his vehicle with his gun drawn, she initially "froze" before pulling out her cell phone and running down the street with the defendant in pursuit with gun and shovel in hand. While Pinchuk's testimony that when she took off running, she was chased down by the armed defendant and struck with a shovel, if believed, would satisfy the element in the unlawful restraint statute requiring proof that a defendant's conduct exposed a victim to the substantial risk of injury, there is no evidence that

the defendant restricted Pinchuk's movement from the driveway or confined her to the patio steps after he hit her. To the contrary, her immediate flight demonstrates the absence of restraint. Thus, the evidence was inadequate to satisfy the restraint aspect of the statute. As noted, in order to convict a defendant of unlawful restraint in the first degree, the state must prove not only that the defendant's conduct exposed the victim to a substantial risk of physical harm, but the state must also prove that the risk was created by the defendant's restraint of the victim. As we have previously noted, "[u]nlawful restraint in the first degree requires that the defendant had the specific intent to restrain the victim." *State* v. *Joseph*, 116 Conn. App. 339, 344, 976 A.2d 772 (2009); see, e.g., *State* v. *Robinson*, 81 Conn. App. 26, 34–35, 838 A.2d 243 (evidence sufficient for first degree unlawful restraint when defendant prevented victim from leaving his vehicle by putting his arms around her and then blocking her path once she exited car, as well as tackling victim as she was running away and dragging her back to his vehicle), cert. denied, 268 Conn. 921, 846 A.2d 882 (2004); *State* v. *Luster*, 48 Conn. App. 872, 880–81, 713 A.2d 277 (evidence sufficient for first degree unlawful restraint when elderly victim struggled with and resisted defendant, who was on top of her and using force to keep her in bed, and only when defendant voluntarily removed himself from victim, after his stepdaughter entered bedroom, was victim freed of her restriction on bed), cert. denied, 246 Conn. 901, 717 A.2d 239 (1998). In the present case, Pinchuk was able to move from the driveway where Diaz and Illescas were held and while the defendant chased after her. Additionally, she testified that once the defendant caught up to her and struck her, he ran off when someone yelled in their direction. As a consequence, the evidence is insufficient to sustain the defendant's conviction of unlawful restraint as it relates to Pinchuk.

In sum, we conclude that there is a reasonable view of the evidence that supports the jury's verdict of guilty of unlawful restraint in the first degree as to Illescas and Diaz, but the evidence was insufficient to sustain the jury's verdict as to Pinchuk. Therefore, we are persuaded that we must reverse the judgment convicting the defendant of the count of unlawful restraint as to Pinchuk.

II

The defendant next claims that his due process rights were violated by the court's jury instructions. Specifically, the defendant claims that he was deprived of the jury's consideration of his theory of defense because the court: (1) failed to charge that the special defenses would apply to a mere show of force; (2) marshaled the evidence impermissibly in favor of the state; (3) improperly instructed jurors that evidence that his pointing of a loaded weapon at the victims was sufficient to prove the statutory element of substantial risk of physical injury beyond a reasonable doubt; and (4) declined to mark the written instructions furnished to jurors as a court exhibit. Although we respond to each of these claims separately, we turn first to the parameters of our appellate review of claims of instructional error.

"The standard of review for claims of instructional impropriety is well established. [I]ndividual jury instructions *should not be judged in artificial isolation*, but must be viewed in the context of the overall charge. . . . The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . Thus, [t]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the proper

verdict . . . and *not critically dissected in a microscopic search for possible error.* . . . Accordingly, [i]n reviewing a constitutional challenge to the trial court's instruction, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury. . . . In other words, we must consider whether the instructions [in totality] are sufficiently correct in law, adapted to the issues and ample for the guidance of the jury." (Emphasis in original; internal quotation marks omitted.) *State* v. *Castillo*, 121 Conn. App. 699, 707, 998 A.2d 177, cert. denied, 297 Conn. 929, 998 A.2d 1196, cert. denied, 562 U.S. 1094, 131 S. Ct. 803, 178 L. Ed. 2d 537 (2010).

## A

First, the defendant argues that the court erred in its jury charge on his special defenses when it failed to instruct the jurors that a show of force directed at him by any of the alleged victims would entitle him to use reasonable force in self-defense and in defense of his premises.[3] The following additional facts are relevant to this claim. The defendant's defense was that he did not unholster his gun during the confrontation with Diaz, Illescas and Pinchuk, but that he merely displayed his weapon by pulling his shirt away from his shoulder holster in a show of force he believed was justified by the circumstances. It is the defendant's contention that

---

[3] The court charged on the defense of premises, tracking General Statutes § 53a-20 in relevant part: "A person in possession . . . of premises . . . is justified in *using reasonable physical force* upon another person when and to the extent that he reasonably believes such to be necessary to prevent or terminate the commission . . . of a criminal trespass by such other person in or upon such premises." (Emphasis added.)

The court also charged on the defense of self-defense, essentially tracking General Statutes § 53a-19 (a) as follows: "[A] person is justified *in using reasonable physical force* upon another person to defend himself when he reasonably believes to be the use of imminent use of physical force. And he may use such degree of force which he reasonably believes necessary for the purpose." (Emphasis added.)

the mere display of a holstered weapon represented a reasonable response to the victims' behaviors. Consistent with this approach to his defense, the defendant testified that he merely displayed the butt of his holstered gun in response to Diaz and Illescas' refusal to put down the tools they were holding and to prevent them from causing any more damage to his property. Thus, the defendant's theory of defense was premised on his, and not the state's view, of the evidence and, based on his factual claims, he asserts that if the mere display of his weapon constituted unlawful restraint, his actions were justified under either a theory of self-defense or in defense of his premises.

The state's response to this claim on appeal, however, is that the court was not required to recite these factual allegations by the defendant in its charge on the special defenses because the special defenses of defense of property and self-defense would only be responsive to the state's claim that the defendant and Angelo Ciullo actually unholstered their weapons and pointed them at Diaz and Illescas. Thus, the state responds, the court properly charged the jury that it could find the defendant guilty of unlawful restraint only if it found that he had acted in the manner claimed by the state. Accordingly, the state claims, there was no reason for the court to repeat the defendant's claims in this regard during the portion of its charge relating to self-defense or defense of property. We agree. The defendant's self-defense and defense of property claims were not responsive to the allegations framed by the state; rather, they constituted a denial of the state's claims regarding his use of his weapon. We agree with the state's argument that the court was not required to instruct the jury on self-defense and defense of premises on the basis of the defendant's version of the events and that the court correctly instructed the jury on these defenses based on the state's claims because, in order to assess

the defendant's culpability, the jury was required to determine whether the state had proven that the events took place in the manner claimed by the state.

In sum, the court properly instructed that the jury need only consider the special defenses if it first found the defendant guilty of unlawful restraint, which required it to conclude that the defendant had actually pulled the gun from its holster and pointed it at Diaz and Illescas.[4] Thus, if the jury did not believe the state's theory of the case, it would not have had any reason to consider the defendant's claims of self-defense and defense of property. Accordingly, we conclude that the court did not err in declining to instruct the jury on the defendant's version of the relevant events as part of its instruction on self-defense and the defense of premises.

B

Next, the defendant claims that the court marshaled the evidence in an impermissible manner that gave the jurors only the prosecution's view of the evidence. The defendant argues that the court's instructions highlighted the state's evidence and ignored his contrary testimony that he never unholstered his weapon as the laborers continued to brandish their tools despite his request that they put the tools down. The defendant claims that the manner in which the court marshaled

---

[4] The court provided the following instructions to the jury concerning the defense of premises: "After you have considered all of the evidence in this case, if you find the state ha[s] proven beyond a reasonable doubt each element of the crime of unlawful restraint . . . you must then consider the defense of premises with regard to those counts in which you found the [defendant] guilty with regard to the unlawful restraint or the lesser included offense."

The court similarly instructed for self-defense: "After you have considered all of the evidence in this case, if you find that the state has proved beyond a reasonable doubt each element of the crime of which self-defense applies, either the charge of unlawful restraint in the first degree or unlawful restraint, you must then go on to consider whether or not the [defendant] acted in self-defense."

the evidence was tantamount to an endorsement of the state's case, thus depriving him of a fair trial. We disagree.

"A trial court has broad discretion to comment on the evidence adduced in a criminal trial. . . . A trial court often has not only the right, but also the duty to comment on the evidence. . . . The purpose of marshaling the evidence . . . is to provide a fair summary of the evidence, and nothing more; to attain that purpose, the [trial] judge must show strict impartiality. . . . To avoid the danger of improper influence on the jury, a recitation of the evidence should not be so drawn as to direct the attention of the jury too prominently to the facts in the testimony on one side of the case, while sinking out of view, or passing lightly over, portions of the testimony on the other side, which deserve equal attention. . . .

"On review, we do not evaluate the court's marshaling of the evidence in isolation. Rather, [t]o determine whether the court's instructions were improper, we review the entire charge to determine if, taken as a whole, the charge adequately guided the jury to a correct verdict. . . . The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . [I]n appeals involving a constitutional question, [the standard is] whether it is reasonably possible that the jury [was] misled." (Internal quotation marks omitted.) *State v. Little*, 88 Conn. App. 708, 712–13, 870 A.2d 1170, cert. denied, 274 Conn. 916, 879 A.2d 895 (2005).

On the basis of our thorough review of the instructional charge, we conclude that the court did not unfairly marshal the evidence by highlighting the state's version of the operative events. As discussed in part II A of this opinion, the court's failure to highlight the

defendant's testimony that he merely displayed but did not unholster his weapon was proper in light of the prosecution's theory of the case that a verdict of unlawful restraint could only be premised on the jury's finding that the defendant, in fact, brandished his weapon while pointing it at the laborers and instructing them not to move. We further note that the court's instructions and references to the evidence were prefaced by its instruction regarding the jury's role as the fact finder and the court's direction that the jurors were to rely on their own recollections of the evidence, not the court's reference to facts in the charge.[5] "[A]bsent clear evidence to the contrary, we presume that the jury followed the court's instructions." *State* v. *Nance*, 119 Conn. App. 392, 405, 987 A.2d 376, cert. denied, 295 Conn. 924, 991 A.2d 569 (2010). We conclude, therefore, that the court's instructions to the jury did not improperly marshal the evidence in the state's favor.

## C

The defendant also claims that the court erred in its charge on unlawful restraint when it instructed the jury that "[p]ointing a loaded gun at a person has been determined by our Appellate Court to be a risk of physical injury."[6] Specifically, the defendant maintains that the

---

[5] The court specifically instructed: "If, during this charge, I refer to certain evidence [or] facts, my purpose is to allude to them only to make clear to you the application of the rules of law that are relevant in this case. When I do refer to certain evidence or facts, you are not to assume I mean to emphasize that evidence or those facts, nor must you limit your consideration only to them. Should I overlook any evidence in the case, you will supply it from your own recollection, if I do address any of the evidence. And if I should incorrectly state any of the evidence to your own recollection, you can correct my error and apply your own recollection."

[6] The court instructed: "A substantial risk of physical injury means considerable risk of physical injury. If you find that the [defendant] did, in fact, point loaded pistols at the day workers, our Appellate Court has considered that a risk of physical injury. Pointing a loaded gun at a person has been determined by our Appellate Court to be a risk of physical injury. But you have to find that an actual pointing of guns occurred in this case."

court instructed the jury, as a matter of law, that the element of substantial risk of physical injury had been proven beyond a reasonable doubt by the state's evidence that the defendant had pointed his weapon at the laborers.[7]

At the outset, we note that the portion of the unlawful restraint instruction that the defendant challenges on appeal was one sentence in the court's lengthy charge that included instructions on the jury's function in weighing the evidence, burden of proof, the elements of the crime and the requirement that the state prove each and every element of the crimes charged beyond a reasonable doubt.[8] Additionally, in charging the jury that the mere pointing of a weapon at an individual has been determined to be adequate proof of unlawful restraint, the court did not state or infer that the state had proved the factual predicate. Rather, the court was simply instructing the jury on a point of law that such behavior, if proven, would satisfy a legal requirement for culpability. Here, the court properly distinguished between the court's function in stating the law, and the jury's function of applying the law to the facts as it

[7] At trial, defense counsel took an exception to the court's instruction as not being a correct statement of the law. On appeal, however, the defendant has not pursued this contention; rather, he challenges the instruction on the ground that the court's recitation of the law was tantamount to a direction to the jury to find him guilty of unlawful restraint. We note, parenthetically, that although we have not discovered any Connecticut appellate law in support of the view that pointing a loaded weapon at a person is sufficient evidence, by itself, of the creation of a substantial risk of physical injury, other jurisdictions have come to such a conclusion. See, e.g., *Al-Saud* v. *State*, 658 N.E.2d 907, 910 (Ind. 1995) (brandishing firearm, regardless of whether unloaded or loaded, can create substantial risk of bodily injury); *Key* v. *Commonwealth*, 840 S.W.2d 827, 829 (Ky. App. 1992) (recognizing that pointing of gun, whether loaded or unloaded, provided there is reason to believe gun may be loaded, constitutes conduct that creates substantial danger of death or serious injury); *State* v. *Napier*, 704 A.2d 869, 871–72 (Me. 1998) (pointing loaded gun at police officer constitutes reckless conduct defined as "substantial risk of serious bodily injury to another person").

[8] See footnotes 4 through 6 of this opinion.

finds them, by reminding the jury: "But you have to find that an actual pointing of guns occurred in this case."

Thus, we do not read the challenged instruction as directing the jury to conclusively determine that there was a substantial risk of physical injury or that the defendant pointed his weapon at the laborers. In sum, the instruction suggested to the jury a permissible legal conclusion should the jurors find that the state's evidence satisfied them that the defendant did actually point a weapon at Diaz and Illescas while leaving to the jury the factual determination of whether the defendant had unholstered and pointed a weapon at Diaz and Illescas as claimed by the state. We conclude that, in totality, the instruction regarding unlawful restraint was sufficiently correct in law, adapted to the issues and provided ample guidance for the jury.

D

The defendant's last instructional error claim is that the court failed to give defense counsel a copy of the written instructions it submitted to the jury and refused to mark the instructions as a court exhibit. Specifically, the defendant claims that the court's refusal to give counsel a copy of the written instructions prevented counsel from determining whether the written instructions varied from the oral instructions delivered in court.

Because the defendant has not provided us with a copy of the written instructions, we have no basis for determining whether there was any variance between the court's written and oral instructions. It is the duty of the appellant to provide an adequate record for review, even to the point of seeking rectification of the record when appropriate. See Practice Book § 66-5. Because we do not know the contents of the written instructions given to the jury, we have no basis for determining whether the court abused its discretion in its refusal

to have marked as a court exhibit its written jury instructions.

## III

The defendant claims that he was denied his right to a fair trial due to several instances of prosecutorial impropriety. Specifically, the defendant argues that the prosecutor improperly vouched for the credibility of witnesses. We are not persuaded.

"In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial." (Internal quotation marks omitted.) *State* v. *Jordan*, 135 Conn. App. 635, 664, 42 A.3d 457, cert. granted on other grounds, 305 Conn. 918, 47 A.3d 388 (2012).

Therefore, we must first determine whether the prosecutor's conduct constituted prosecutorial impropriety. During closing argument, the prosecutor referred to the testimony by Diaz and Illescas, and he stated: "And those men are credible. I think they are both from Peru. I have a feeling like they would have walked over the Peruvian Andes mountains to get here." After defense counsel objected, the prosecutor went on to explain: "Well, what I will say is that common sense suggests, I didn't mean to put it that way, common sense and the evidence suggest that they would have walked a thousand miles to testify in this case." He then later stated: "That's why they were here, honest, outraged. That's why they testified truthfully and accurately . . . ." The defendant contends that these comments constitute improper vouching by the prosecutor.

"We consistently have held that it is improper for a prosecuting attorney to express his or her own opinion,

directly or indirectly, as to the credibility of witnesses. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . Put another way, the prosecutor's opinion carries with it the imprimatur of the [state] and may induce the jury to trust the [state's] judgment rather than its own view of the evidence. . . . Moreover, because the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence . . . it is likely to infer that such matters precipitated the personal opinions. . . .

"The prosecutor, however, is not barred from commenting on the evidence presented at trial or urging the jury to draw reasonable inferences from the evidence that support the state's theory of the case, including the defendant's guilt. It is not improper for the prosecutor to comment [on] the evidence presented at trial and to argue the inferences that the [jury] might draw therefrom . . . . We must give the jury the credit of being able to differentiate between argument on the evidence and attempts to persuade [it] to draw inferences in the state's favor, on one hand, and improper unsworn testimony, with the suggestion of secret knowledge, on the other hand. The [prosecutor] should not be put in the rhetorical straitjacket of always using the passive voice, or continually emphasizing that he is simply saying I submit to you that this is what the evidence shows, or the like." (Citations omitted; internal quotation marks omitted.) *State* v. *Long*, 293 Conn. 31, 38–39, 975 A.2d 660 (2009).

On the basis of our careful review of the alleged instances of impropriety by the prosecutor during closing argument, we conclude that the statements made by the prosecutor did not suggest a personal belief in the credibility of the witnesses' testimony apart from

the evidence and that the prosecutor's comments could fairly be seen as being based on inferences permitted by the evidence.[9] "[A] prosecutor may properly comment on the credibility of a witness where . . . the comment reflects reasonable inferences from the evidence adduced at trial." (Internal quotation marks omitted.) *State* v. *Luster*, 279 Conn. 414, 438, 902 A.2d 636 (2006). Contrary to the defendant's claim, we view the prosecutor's comments as an effort to invite the jury to draw a reasonable inference that Diaz and Illescas were motivated to tell the truth because the defendant's actions had humiliated them. See *State* v. *Skidd*, 104 Conn. App. 46, 66, 932 A.2d 416 (2007) (proper comment on witness motivation to be truthful based on "ascertainable motives" of the witness rather than prosecutor's personal opinion). In sum, we believe that the statements made by the prosecutor regarding the motivation of Diaz and Illescas to testify truthfully were not improper because the comments reasonably flowed from the direct evidence together with inferences the jury could reasonably infer from the evidence.

IV

The defendant additionally claims that he was denied a fair trial by an impartial jury because the court improperly denied his motion for a mistrial due to jury misconduct. We begin with a recitation of additional facts

[9] The prosecutor based his explanation of the witnesses' motives to tell the truth on Diaz' testimony that he ran behind Pinchuk and on Illescas' testimony that he cried and begged and then referenced this testimony when he stated: "As a matter of fact, both [Illescas] and [Diaz] testified to facts that give their testimony a little ring of the truth. You have Job Diaz testifying that he was so scared he ran behind Ms. Pinchuk. . . . And no one wants to admit that when the fur flies, you run behind an old woman. . . . That's the type of thing you only admit if it was true. And he came in here and he said things that had to be true. You just don't make that up. And that, by the way, is what common sense tells us what motivated him to come here in the first place. . . . And that honest sense of outrage by those two men, that honest sense that they have been humiliated is what motivated them to come in here and testify as honestly and as accurately as they could. And [Illescas] had to admit the same kind of things. . . . [A] man doesn't

relevant to this claim. Initially, after the state had commenced the presentation of evidence, one juror, M.C.,[10] was dismissed from the panel because she had spoken with one of the prosecution's witnesses outside of the courthouse. After she was dismissed, M.C. attempted to contact the court to assert a claim that members of the jury had been discussing the evidence and credibility of the witnesses during the presentation of the evidence. When she failed to reach the court, she contacted defense counsel, who brought the juror's allegations to the attention of the court. The court, thereafter, brought M.C. to the courtroom and examined her under oath. In sum, M.C. testified that jurors had discussed the defendant's ethnic background, including the possible mob affiliation of the defendant, and she claimed that jurors made various other comments about witnesses and counsel. She also stated that a Spanish speaking juror had opined to other jurors that the court interpreter had not accurately interpreted the testimony of two Spanish speaking witnesses. Following M.C.'s testimony, and pursuant to State v. Brown, 235 Conn. 502, 668 A.2d 1288 (1995) (en banc), the court conducted a hearing during which it questioned each of the jurors regarding M.C.'s allegations. At this hearing, the court gave defense counsel and the state the opportunity to question each juror as well.

The hearing revealed that prior to the commencement of evidence, and while the jurors were discussing why they may have been selected for jury service, one juror, D.P., told the other jurors that he stated during questioning that he thought that the defendant and Angelo Ciullo looked like they were in the Mafia. All of the

---

easily admit that he is on his knees begging and crying while someone is jamming a gun into their neck. You wouldn't admit that in that situation, you begged and you cried, unless it was true."

[10] We use the initials of the jurors to protect their legitimate privacy interests.

jurors remembered this comment made by D.P. and further testified that it was one isolated comment and that the Mafia or mob was never discussed again. D.P. explained his comment as having "nothing to do with the case. We were talking about why we were all surprised that we were picked for jury duty." Some jurors remembered a discussion of the ethnicity of the defendant's last name—"[w]e were wondering what type of last name Ciullo would be"—but that it was not related to the discussion of the Mafia and that it never came up again. In response to questions about the court interpreter, all but one of the jurors testified that the Spanish speaking juror, D.M., had commented about the translation. Those who remembered the discussion stated that D.M. had actually vouched for the interpreter, "that he was doing a good job," or made reference to the style of the translation, that it was a "[a] very formal translation," and that the interpreter was translating "word for word." Two other jurors remembered comments about physical attributes of the interpreter, namely, that "somebody said he was tall" and that "[i]t was one of those joke interpretations. . . . [T]hey thought his eyes were big, but they said he looked like he was on crack."

After the hearing, the defendant moved for a mistrial. The defendant admitted that some of the statements, when considered alone, were relatively inconsequential and not prejudicial to him. He argued, however, that the statements, especially those regarding the Mafia and his ethnicity, compromised his right to a fair and impartial jury, and that on those grounds only a mistrial would be sufficiently curative. The court denied the defendant's motion, concluding that the grounds for a mistrial did not exist.

First, we recognize that "[j]ury impartiality is a core requirement of the right to trial by jury guaranteed by the constitution of Connecticut, article first, § 8, and

by the sixth amendment to the United States constitution. . . . In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors. . . . The modern jury is regarded as an institution in our justice system that determines the case solely on the basis of the evidence and arguments given [it] in the adversary arena after proper instructions on the law by the court. . . . The United States Supreme Court has noted, however, that the [c]onstitution does not require a new trial every time a juror has been placed in a potentially compromising situation . . . [because] it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. . . . Were that the rule, few trials would be constitutionally acceptable. . . . We have recognized, moreover, that [t]he trial court, which has a first-hand impression of [the] jury, is generally in the best position to evaluate the critical question of whether the juror's or jurors' exposure to improper matter has prejudiced a defendant." (Internal quotation marks omitted.) *State* v. *Zapata*, 119 Conn. App. 660, 696–97, 989 A.2d 626, cert. denied, 296 Conn. 906, 992 A.2d 1136 (2010).

Our role, on appeal, is to determine "whether the trial court's review of alleged jury misconduct can fairly be characterized as an abuse of its discretion." *State* v. *Brown*, supra, 235 Conn. 524. "Although we recognize that trial [c]ourts face a delicate and complex task whenever they undertake to investigate reports of juror misconduct or bias . . . we nevertheless have reserved the right to find an abuse of discretion in the highly unusual case in which such an abuse has occurred. . . . *Ultimately, however, [t]o succeed on a claim of [juror misconduct] the defendant must raise his contention of [misconduct] from the realm of speculation to the realm of fact.*" (Emphasis in original; internal quotation marks omitted.) *State* v. *Mucha,* 137 Conn.

App. 173, 181, 47 A.3d 931, cert. denied, 307 Conn. 912, 53 A.3d 998 (2012).

Here, the court properly conducted a *Brown* inquiry, made credibility determinations and concluded that there were no grounds for a mistrial. The court determined that the remaining jurors could be impartial and base their decisions on the evidence and the law. The court explained, "I found no inconsistencies in the jurors' response. I found that they did admit that there were discussions, and did admit observations and other things like that, but that nobody got up and said a conclusion that the [defendant] must be guilty, based on my observations and based on what I heard. And all of them said they would be able to keep an open mind to the very end of the trial. And I have to either accept the testimony of these jurors or the testimony in conflict [with what M.C.] said. And realizing her first day of response and a refusal to speak, realizing the sudden revelations and sudden recollections, some of which were just totally contrary to what, even when they were talking about the same thing, what the jurors said. I must accept the testimony of the jurors . . . ."

Our Supreme Court has recognized that "[t]he trial court, which has a first-hand impression of [the] jury, is generally in the best position to evaluate the critical question of whether the juror's or jurors' exposure to improper matter has prejudiced a defendant." (Internal quotation marks omitted.) *State* v. *Weinberg*, 215 Conn. 231, 249, 575 A.2d 1003, cert. denied, 498 U.S. 967, 111 S. Ct. 430, 112 L. Ed. 2d 413 (1990). We conclude that the court did not abuse its discretion in denying the defendant's motion for a mistrial.

V

Last, the defendant makes two evidentiary claims. The defendant claims that the court improperly precluded him from introducing a surveillance videotape

into evidence and that the court erred in precluding certain testimony of a witness. We disagree.

First we set forth the applicable standard of review. "The trial court's ruling on the admissibility of evidence is entitled to great deference. . . . [T]he trial court has broad discretion in ruling on the admissibility . . . of evidence . . . [and its] ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . Moreover, evidentiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice." (Internal quotation marks omitted.) *State* v. *Vega*, 128 Conn. App. 20, 29, 17 A.3d 1060, cert. denied, 301 Conn. 919, 21 A.3d 463 (2011).

A

The defendant claims that the court erred in not admitting a surveillance videotape of Pinchuk's driveway at the time of the crime. At a hearing on the admissibility of the videotape, the defendant showed that the videotape depicted the movement of two unidentified figures who were walking back and forth in the area of the driveway at the time of the incident. At this same hearing, a police forensic investigator testified that the range of the surveillance camera was limited to an area of Pinchuk's driveway that was fifty-seven feet from the road. The defense argued that the videotape was relevant for the purpose of undermining the credibility of Pinchuk's testimony that the defendant chased her to the rear of her neighbor's home because the videotape would have captured their movements. The court determined that the videotape could not show any activity actually taking place on the road and therefore was not

relevant for the purpose that Pinchuk had not been chased down the road. On appeal, the defendant argues that the considerations relied on by the court in precluding the videotape pertained to the weight to be accorded the witness' testimony, not to its admissibility, and that he was substantially prejudiced because he "lost critical impeachment evidence . . . ." We are not persuaded.

On the basis of our review, we conclude that the court did not abuse its discretion when it determined that the videotape was not relevant to the issue of whether Pinchuk had been chased down the road. The court was entitled to consider the proffered evidence that the videotape was not able to capture any activity taking place on the road and that the only figures visible were not identifiable. See *State* v. *Stephenson*, 131 Conn. App. 510, 527, 27 A.3d 41 (2011) ("[t]he trial court has wide discretion to determine the relevancy [and admissibility] of evidence" [internal quotation marks omitted]), cert. denied, 303 Conn. 928, 36 A.3d 240 (2012). We, therefore, conclude that there was no abuse of discretion in the exclusion of the videotape.

B

The defendant claims that the court improperly precluded him from eliciting certain testimony concerning Pinchuk's reputation for untruthfulness. In an offer of proof, out of the presence of the jury, the defendant and Pinchuk's neighbor, Hyman, testified regarding Pinchuk's accusation of workers at Hyman's house trespassing on her property and taking things, of giving Hyman's house address instead of hers to creditors and to the police, and her having declared that she was going to take property whether it was from the defendant or Hyman. The court determined that there was no foundation for Hyman's opinion that Pinchuk was not truthful because the specific incidents proffered by the defendant portrayed only Pinchuk's "obnoxiousness"

or even her "madness or maybe indications of her wrongness," but not her truthfulness because "she may firmly believe what she is saying."

In Connecticut, evidence relating to the truth and veracity of a witness may be elicited by either evidence of the witness' general reputation in the community for veracity or proven by opinion evidence of those who have formed an opinion as to the character of the witness with respect to truth and veracity. See Conn. Code Evid. §§ 4-4 (a) (3) and 6-6 (a); see also *State* v. *Pettersen*, 17 Conn. App. 174, 181, 551 A.2d 763 (1988), on appeal after remand, 20 Conn. App. 288, 566 A.2d 714 (1989), cert. denied, 213 Conn. 814, 569 A.2d 550 (1990). "A witness may be impeached by evidence of specific acts of misconduct that relate to veracity, but not by those that merely illustrate general bad behavior. . . . A court has wide discretion, however, to exclude such evidence if it has only slight relevance due to its remoteness in time, its minimal bearing on credibility, or its tendency to inject a collateral issue into the trial." (Citations omitted.) *State* v. *Lewis*, 26 Conn. App. 574, 579, 602 A.2d 618, cert. denied, 221 Conn. 923, 608 A.2d 688 (1992).

In the case at hand, the evidence proffered by the defendant demonstrated that Hyman's knowledge and opinion of Pinchuk was garnered from a series of interactions that did not specifically relate to her character with respect to truth or veracity. Rather, as the court determined, these incidents might have been indicative of her trait for contention or litigiousness but did not distinctly demonstrate a reputation for untruthfulness. Furthermore, the defendant did not show that Hyman had sufficient verification of Pinchuk's truthfulness or lack thereof to form an opinion on the topic. Accordingly, we conclude that the court acted well within its discretion in excluding the proposed testimony.

The judgment is reversed only as to the conviction of one count of unlawful restraint relating to the victim Pinchuk and the case is remanded with direction to render judgment of acquittal on that count and for resentencing. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.